**HICKORY NEIGHBORHOOD
DEFENSE LEAGUE,**
Plaintiff,

v.

**James BURNLEY, Secretary of the United States Department of Transportation; Robert E. Farris, Administrator of Federal Highway Administration; James Harrington, Secretary, North Carolina Department of Transportation; George E. Wells, North Carolina State Highway Administrator, Defendants.**

No. C–C–88–195–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Dec. 15, 1988.

Michael S. Scofield, Mary V. Carrigan, Charlotte, N.C., for plaintiff.

Clifford C. Marshall, Asheville, N.C., James E. Scapellato, Federal Highway Admin., Atlanta, Ga., James B. Richmond, Raleigh, N.C., for defendants.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER came on to be heard and was heard before the undersigned without a jury at Charlotte, North Carolina on November 7, 8, 9, and 10, 1988.

Plaintiff was represented by Michael S. Scofield, Esquire, and Mary V. Carrigan, Esquire. The State Defendants were represented by James B. Richmond, Special Deputy Attorney General. The Federal Defendants were represented by James E. Scapelleto, Regional Counsel, Federal Highway Administration.

### PARTIES

Plaintiff, Hickory Neighborhood Defense League, (HNDL), is a non-profit corporation, organized and existing under the laws of North Carolina. HNDL is comprised of local residents of Hickory, North Carolina, including individuals owning homes and businesses along that portion of N.C. Highway 127 scheduled to be widened, and members of the community at large. On October 23, 1986, the Claremont Historic District, (CHD) containing several properties within the area proposed for widening, was placed on the National Register of Historic Places (National Register) as an historic district. The HNDL contends that the members of the association, including more than residents of this Historic District, will be adversely affected by the proposed project of the Defendants.

Defendant James Burnley is Secretary of the United States Department of Transportation (Federal DOT). Defendant Ray A. Barnhart (nee Farris) is the Administrator of the Federal Highway Administration (FHWA). Defendants Burnley and Barnhart are responsible for the approval, authorization, environmental review and the administration of projects undertaken pursuant to the Federal–Aid Highway Act (FAHA), the Department of Transportation Act of 1966, the National Environmental Policy Act of 1969 (NEPA), the National Historic Preservation Act of 1966 (NHPA), and the regulations implementing those statutes.

Defendant James Harrington is Secretary of the North Carolina Department of Transportation (NCDOT). Defendant George E. Wells is the North Carolina State Highway Administrator (NCSHWA). Defendants Harrington and Wells are responsible at the state level for carrying out certain responsibilities delegated by statute regarding the approval, authorization, environmental review, administration and construction of highway projects undertaken pursuant to the FAHA, the Department of Transportation act, NEPA, NHPA, and the regulations implementing those statutes. The Administrative Record consists of documents from the Federal Agencies designated "FAR" and documents from the State Agencies designated "SAR".

## FINDINGS OF FACT

*Nature of the Action*

(1) Hickory Neighborhood Defense League (HNDL) seeks to enjoin the proposed widening project of N.C. 127, a principal

north/south urban arterial highway in Hickory, North Carolina. The projected widening raises the following questions: (1) whether the United States Secretary of Transportation and other Defendants failed to comply with Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. Section 1653(f) (current version at 49 U.S.C. Section 303) (subsequently cited as Section 4(f)) by arbitrarily concluding that there is no feasible and prudent alternative to the use of protected resources and by failing to include all possible planning to minimize harm to protected resources; and (2) whether the Secretary of Transportation and other Defendants failed to comply with Section 102 of the NEPA, 42 U.S.C. Section 4332, by failing to consider adequately all reasonable alternatives and to assess adequately all project impacts.

(2) N.C. 127 in the City of Hickory is a two and three lane State highway which begins south of the City of Hickory, North Carolina and runs through the City to Alexander County in the north. The project would affect approximately 4.6 miles of the existing road by widening the section from 2nd Avenue N.E. to Cloninger Mill Road (S.R. 1400) to provide a 5–lane curbed facility within an 80–foot right-of-way At present, from 2nd Avenue to 29th Avenue, Highway 127 has two basic lanes with a left turn lane at intersections with signals. From 29th Avenue north, Highway 127 has 24 feet of pavement, 8 feet of shoulders and a right-of-way 48 feet wide. Except for a portion of the block between 3rd and 4th Avenues N.E., Highway 127 borders or passes through the Claremont Historical District (CHD) from 1st Avenue N.E. to a point somewhat north of 5th Avenue N.E.

*Chronology*

(3) In 1966, the City of Hickory designated N.C. 127 as a major north/south thoroughfare and it is presently the only principal north/south urban arterial serving the City of Hickory. (SAR A).

(4) In 1975, NCDOT included the proposed widening improvements in its transportation improvement plan thereby preserving its eligibility to receive federal assistance (FAR 41A, Final Environmental Impact Statement (FEIS)). City and County officials (with exception of Hickory Board of Education) have consistently supported the widening of N.C. 127 (FAR 41A, FEIS, p. 20, pp. 109–111 and FAR 95). On February 21, 1975, NCDOT, with FHWA concurrence, hired the consulting firm of Wiley & Wilson, Inc. to prepare the required environmental studies (FAR 4, 6, and 7). NCDOT and the consultant conducted three public meetings to obtain needed information from interested parties concerning the study corridor, alternatives, and project impacts (FAR 8, 9, 10, 11, 12, 13, and 14).

(5) Based on comments from the three public meetings, a draft environmental impact statement (DEIS) was prepared and circulated for comment in 1976 (FAR 15, 21A and 32) (SAR 50, 61, 102). The DEIS analyzed the following five build alternatives: widening existing N.C. 127, two one-way pairs, an eastern route, and a middle route along with the alternatives of postponement and no build. Environmental, social and economic impacts associated with each build alternative were analyzed and discussed in the DEIS (FAR 21A).

(6) The DEIS was circulated to various state, federal and local agencies, as well as the public at large, and it generated numerous positive and negative comments about the project undertaking (FAR 41A, FEIS, pp. 71–112). It was finalized in 1977. The eastern and middle routes were eliminated from detailed study because, according to trip destination studies, these routes would not relieve the flow of traffic on 127 (FAR 41A p. xv). The selected alternative was widening.

(7) In December 1976, it was determined that, in addition to the Shuford House, the Queen Anne House met the criteria for inclusion in the National Register. As a result, the FEIS contained two Section 4(f) statements treating the Shuford House and the Queen Anne House indi-

vidually with respect to the project's impacts. The Defendants' Section 4(f) evaluations concluded that there were no feasible and prudent alternatives to the use of land from each property and that all possible planning had been implemented to minimize harm (FEIS, Appendix D and E).

(8) Following the approval of the FEIS in 1977, the project remained in the North Carolina Highway Improvement Program without action through 1979. It was not scheduled in the 1981 Program but reappeared in 1983 (FAR 47A). This delay occurred because of funding problems.

(9) The 1983 Thoroughfare Plan for Hickory, Figure 5, indicates that 127 was operating at over capacity (FAR 47A).

(10) Based on projections by the NCDOT the average daily traffic (ADT) on this road in the year 2000 will range from 18,000 at Cloninger Mill Road to 37,000 at 8th Avenue (FAR 41A), and from 21,-200 ADT to 38,300 ADT along the same route by the year 2005 (FAR 64, p. 1) (SAR 211).

(11) In 1984, the Hickory Historic Properties Commission notified NCDOT that it was proposing the designation of the CHD for nomination to the National Register (SAR 145). This District began formation in the late 1800's and today represents one of two intact historic, residential neighborhoods in Hickory, North Carolina. The District contains significant examples of many architectural styles of the 1870's through the mid–1900's and includes homes of early and prominent Hickory businessmen, professionals and educators, including the Shuford family (FAR 48). The Hickory His-

toric Properties Commission in notifying NCDOT, by letter dated November 23, 1984, of the nomination, repeated their endorsement of the widening despite the nomination, in the following language:

> The Historic Properties Commission wants the Department of Transportation to know that we are not opposed to the widening of NC 127 and that we are not working against the implementation of that project. As residents of the City of Hickory we are aware of the serious traffic problems that exist on this road and we support the efforts to upgrade this major traffic artery. We are corresponding our sentiments by carbon copy to the North Carolina Division of Archives and History and trust that a satisfactory course of action which will not jeopardize the NC 127 project can be arranged. If necessary, the Historic Properties Commission will consider a request to the Division of Archives and History to delay, withdraw or redefine the Claremont College Historic District nomination so as not to interfere with the NC 127 widening program. (SAR 145).

(12) The CHD contains 14 pivotal buildings and 36 contributing buildings. The former Claremont High School has been rehabilitated to house the Catawba Council for the Arts. The streets are lined with mature trees ranging up to 100 years old.

(13) Out of the 14 pivotal buildings and 36 contributing buildings in the CHD, Highway 127 passes through a portion of the CHD which contains five pivotal buildings, and five contributing buildings and one non-contributing building shown on Table I of FAR 64 as follows:

TABLE I
PROPERTY LOCATION AND CLASSIFICATION

| Inventory Number | Property | Location | Classification |
|---|---|---|---|
| 49 | Clara Bell Fox (Heirs) | N.W. corner of NC 127 and 2nd Avenue N.E. | contributing |
| 10 | Queen Anne House (Council property) | S.W. corner of NC 127 and 3rd Avenue N.E. | pivotal |
| 53 | Glenn M. McCall | N.E. corner of NC 127 and 2nd Avenue N.E. | pivotal |
| 9 | Kent Blemore | S.E. corner of NC 127 and 3rd Avenue N.E. | pivotal |
| 28 | Curtis Neal Mauser | N.W. corner of NC 127 and 34th Avenue N.E. | pivotal |
| 22 | James E. Deal | West side of NC 127 adjacent to Mauser property | contributing |

| Inventory Number | Property | Location | Classification |
|---|---|---|---|
| 40 | Nellie Leona Ball | N.W. corner of NC 127 and 4th Avenue N.E. | non-contributing |
| 27 | Dr. Fred S. Gachet, Jr. | South side of 5th Avenue N.E. | contributing |
| 13 | Joyce W. Houston | N.W. corner of NC 127 and 5th Avenue N.E. | contributing |
| 17 | Nora Shufford | East side of NC 127 between 5th Avenue N.E. and 5th Avenue Court N.E. | contributing |
| 1 | Shufford House (Hickory Landmark Society, Inc.) | N.E. corner of NC 127 and 5th Avenue Court N.E. | pivotal |

(14) The project will result in the taking of the non-contributing house (Ball) (Inventory No. 40) and one contributing house (Fox Heirs) (Inventory No. 49). The remaining four contributing houses and three of the five pivotal houses will be affected by condemnation of a portion of the land on which they are located. Two pivotal houses, McCall (Inventory No. 53) and Blemore (Inventory No. 9), will not lose any land, all as shown on Table II (FAR 64):

[THIS SPACE LEFT BLANK INTENTIONALLY.]

TABLE II
TYPE OF DISPLACEMENT AND AMOUNT

| Inventory | Property | Type of Encroachment | Approx. Distance from House to Existing Edge of Pavement | Before Final Design Changes Approx. Distance from House to Proposed Edges of Pavement | After Final Design Changes |
|---|---|---|---|---|---|
| 49 | Fox (Heirs) | displacement of house | 16 ft | t | |
| 10 | Queen Anne House | construction easement proposed ROW proposed road | 67 ft | 35 ft | 40.5 ft |
| 28 | Mauser | construction easement proposed ROW proposed road | 50 ft | 20 ft | 30.0 ft |
| 22 | Deal | construction easement proposed ROW proposed road | 43 ft | 20 ft | 28 ft |
| 40 | Ball | displacement of house | 9 ft | t | |
| 27 | Gachet, Jr. | construction easement proposed ROW proposed road | 53 ft | 41 ft | 41 ft |
| 13 | Houston | permanent const. easement proposed ROW proposed road | 56 ft | 41 ft | 41 ft |
| 17 | Shufford, Nora | construction easement proposed ROW proposed road | 35 ft | 18 ft | 20 ft |
| 1 | Shufford House | construction easement proposed ROW proposed road | 131 ft | 114 ft | 114 ft |

t—the proposed road will result in displacement of the house.

(15) In addition to the land taken, some trees would have to be removed. The number is disputed but even though Plaintiff claims up to 100, it appears that only 30 trees will be removed.

(16) Up to 1986, no major action was taken to advance the project. At the time that the project was reactivated in 1986, the CHD had been nominated for listing on the National Register of Historic Places.

(17) On October 8, 1986, NCDOT stated by letter to FHWA their conclusion that no significant changes had occurred in the proposed action or project area and that the 1977 FEIS was valid. (FAR 55). A wet land investigation was made in 1986 with a finding that the N.C. 127 improvements would not result in any negative impacts on area wetlands (SAR 148).

(18) To comply with Section 106 of the NHPA, NCDOT, and FHWA in 1986 prepared a Preliminary Case Report (PCR) in which the alternatives were again analyzed, and widening N.C. 127 was again

selected as the preferred alternative (FAR 48). Measures to minimize project impacts were developed to ensure protection of the District. Because of the District's nomination to the National Register, the North Carolina Department of Cultural Resources (NCDCR) responded to the PCR by reversing their earlier position that the road improvements would have no effect on the Shuford and Queen Anne Houses. On May 20, 1986, the NCDCR recommended that NCDOT and FHWA reevaluate the project suggesting additional weight be given to the District as a whole (FAR 49).

(19) The PCR was revised to address the concerns and comments of the NCDCR in view of NCDOT's and FHWA's selection of the widening alternatives (SAR 175). Mitigation measures were considered and agreed upon (FAR 50). On July 9, 1986, a Memorandum of Agreement (MOA) was entered into and executed by Defendants and the State Historic Preservation Officer (SHPO) (FAR 52).

(20) The MOA set forth the specific mitigation measures that would be implemented to minimize the harm to the CHD (FAR 52). Since the MOA was executed the SHPO had no further comment on the project (SAR 221).

(21) On October 8, 1986, in compliance with NEPA requirements, NCDOT completed a reevaluation of the project and concluded that no significant changes had occurred in the proposed action to warrant preparation of a supplemental EIS (FAR 55). On November 3, 1986, FHWA concurred with NCDOT's reevaluation assessment and concluded that an SEIS was not required (FAR 58). This conclusion was justified on the ground that the nomination of the CHD to the National Register did not alter or significantly change the environmental, social or economic context of the project which had been previously studied and documented. Notwithstanding NCDOT's and FHWA's decision concerning an SEIS, NCDOT and FHWA prepared and circulated for comment a draft 4(f) evaluation which specifically addressed the project's impacts on the District (FAR 59) (SAR 191).

(22) On February 19, 1987, the Department of Interior (DOI), a Section 4(f) coordinating and commenting agency by law, concurred with NCDOT's and FHWA's conclusion that: (1) there were no feasible and prudent alternatives to the preferred alternative of widening N.C. 127 which will use land from the Claremont District; and (2) all means to minimize harm had been considered. DOI offered no objection to FHWA's Section 4(f) approval of this project (FAR 62). On February 25, 1987, the final Section 4(f) evaluation was finalized subject to the incorporation of the PCR's MOA (FAR 64). On March 23, 1987, FHWA approved the Section 4(f) evaluation (FAR 67), concurring that there were no feasible and prudent alternatives to widening 127 and that the project incorporates all possible planning to minimize harm.

(23) On April 16, 1987 a design public hearing was conducted to afford interested parties another opportunity to take part in the administrative process (FAR 67A). Approximately 125 people attended the hearing; twenty-one people spoke for the project and five people spoke against the project at the hearing (FAR 68, 69, and 70).

(24) After consideration of all comments offered during and after the design public hearing, NCDOT gave design approval on June 10, 1987 (FAR 74). The following day NCDOT requested approval of preliminary plans from FHWA (FAR 78). On June 25, 1987, since no new or compelling information was produced through the hearing process, and no significant changes in the environment occurred, FHWA approved preliminary plans subject to the inclusion of the Section 4(f) mitigation commitments (FAR 78). On August 28, 1987, FHWA authorized right-of-way acquisition and preliminary engineering for utilities (FAR 81).

(25) On April 21, 1988, HNDL filed this lawsuit raising issues of noncompliance with NEPA and Section 4(f). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, and the agreement of all counsel of record, trial of this action on

the merits is advanced rather than holding a preliminary injunction hearing.

(26) The proposed project will widen N.C. 127 to a five-lane curb and gutter facility from 2nd Avenue in the south to Cloninger Mill Road (SR 1401) in the north, a distance of approximately 4.6 miles. From Cloninger Mill Road to the northern end of the project, the roadway tapers from a five lane section to the existing two lanes. From 1st Avenue to approximately 175 feet north of 5th Avenue Court, the project goes through or borders the CHD for approximately 0.6 miles.

(27) From the beginning of the project, just south of 2nd Avenue to 4th Avenue, the roadway is approximately 59 feet face-to-face of curbs. From 4th Avenue north to Timberwood Lane, the roadway will be approximately 64 feet face-to-face curbs. The remaining 0.4 miles is a four-lane divided section with a variable width median from Timberwood Lane to the Northern project terminus at Cloninger Mill Road. (FAR 68).

(28) Four foot concrete sidewalks are provided on either or both sides of the project from 2nd Avenue to 29th Avenue. In the limits of the Historic District, sidewalks are provided on the west between 2nd Avenue and 3rd Avenue, both sides between 3rd Avenue and 4th Avenue, on the east between 4th Avenue and 5th Avenue, and on the west between 5th Avenue and the northern limits of the Historic District. (Def.Ex. 2).

(29) Although widening is generally symmetrical around the existing roadway centerline, from the beginning of the project to approximately halfway between 3rd Avenue and 4th Avenue, all widening will be to the west. In this area the left edge of the pavement will be shifted approximately 25 feet to the west. Asymmetrical widening in this area is necessary to avoid a stone retaining wall that runs along the right (east) side of N.C. 127 from 2nd Avenue to 3rd Avenue. (Def.Ex. 2). Except for a slight flattening of curves and the reduction of property impacts at several locations, all remaining widening is symmet-

rical to Timberwood Lane. From Timberwood Lane to the northern project terminus, new southbound lanes will be constructed west of the existing road. There is no control of access on the project.

(30) The proposed widening of N.C. 127 is grounded in the need to improve an urban north/south thoroughfare traffic arterial that is geometrically substandard and has traffic operations and accident problems. [The State and Federal Administrative Records document that the current level of service is defective from two standpoints: (1) poor operation of this major arterial because of substandard geometrics resulting from the lack of continuity in the number of lanes and the changing lane widths; and (2) friction and dispersion of through traffic onto cross neighborhood streets. These roadway deficiencies, when coupled with peak hour traffic volumes and traffic friction caused by commercial development along N.C. 127 to the north of the Historic District, significantly contribute to operational problems. Despite signalization improvements on N.C. 127, congestion at the seven signalized intersections within the project limits causes traffic to divert onto other local streets and compounds traffic and accident problems. In the absence of road improvements, substandard roadway geometrics will continue to exist causing severe congestion during peak hours and dispersion of traffic through residential neighborhood streets creating further traffic operation and accident problems.]

(31) The methodology utilized by NCDOT to forecast the expected traffic volumes in the design year is based upon the projection of future traffic as reflected by an analysis of historical traffic growth trends from prior years. This methodology uses a growth factor based upon the actual recorded traffic data. This data is assigned a percentage adjustment factor which is reflective of the prior year growth trend and which then forms a reasonable basis to predict expected design year traffic. Before arriv-

ing at a reasonable growth factor, other factors such as population, employment, land use, area growth and development are also considered.

(32) In preparation of the Section 4(f) evaluation, NCDOT updated the FEIS traffic data forecast for the project using a 2005 design year. NCDOT utilized the same forecast methodology in the update as was used in the FEIS. Again, design year traffic increased, clearly underscoring the need for the contemplated road improvements.

(33) The NCDOT methodology used for the N.C. 127 project is the standard methodology employed by the NCDOT for traffic forecasting on other projects, and by highway departments across the country. This methodology is used on such a widespread basis, and has been employed for such a lengthy period of time, because it has been shown to be reliable. In the 1981–1983 period NCDOT developed a comprehensive traffic forecasting model to predict expected traffic volumes for the entire Hickory urban area. As a result of the area being designated a metropolitan urban area, this model was reanalyzed and calibrated in the period 1984–1986 with comprehensive 1984 land use data and traffic counts gathered for the enlarged Hickory–Newton–Conover Planning Area. This model analyzed the total road network improvements contemplated in the Hickory–Newton–Conover thoroughfare plan. This plan contains all long range road improvements, including two eastern facilities, one of which is very similar to that presented in the final EIS and final Section 4(f) evaluation. Even though the model draws traffic from that assigned to N.C. 127, the model substantiates a maximum projected ADT of 29,900 along N.C. 127 and 27,100 ADT specifically in the Historic District for the design year 2010. Approximately 80 percent of all traffic requiring use of N.C. 127 in the Historic District is generated south of the proposed northern terminus of alternates 3A and 3B. Thus, N.C. 127 will continue to serve as the major north/south urban arterial and warrants the planned improvements.

(34) This comprehensive model supported the accuracy of the original forecast and the need for the road improvements. Failure to make the necessary road improvements will cause N.C. 127 to operate at a continually decreasing level of service (LOS) F as well as cause accidents and severe traffic friction on neighborhood streets. (FAR 47A, pp. 18, 22, 23, 24, SAR 211).

(35) LOS calculations describe the operating conditions of an intersection during peak periods. The calculation is a function of the configuration of the intersection and the traffic volume using the intersection. Once calculations are completed, a letter rating, ranging from A (best) to F (worst), is assigned to the intersection. LOS C is planned for in the design year, however, LOS D is acceptable in an urban environment. LOS E means that the intersection is operating at or near capacity, while LOS F represents forced flow operations. *See* Highway Capacity Manual Research Board, Special Report 87, at 111–13, 130–31 (National Research Council 1965). LOS. calculations have recently been updated to reflect more objective measurements. *See also*, Highway Capacity Manual Research Board, Special Report 209, at 1–3 to 1–4, 9–1 to 10–37 (National Research Council 1985).

(36) The methodology and calculations of traffic operations and safety were completed in objective good faith, the methodology had a rational basis; the methodology has been consistently applied to highway projects across the state; and the model reflects relevant considerations. Therefore, the need and purpose for this project are justified from both a traffic capacity and a safety viewpoint.

*Traffic Accidents and Other Safety Considerations Warrant Road Improvements*

(37) An analysis of updated traffic accident data from January, 1985 through March, 1988, reaffirms that N.C. 127 is incapable of safely managing existing traffic and serving future traffic growth. As dis-

cussed in the FEIS, for the period from January, 1972 through June, 1975, the accident rate for N.C. 127 was below the statewide average for similar urban arterials throughout the state. However, for the period from January, 1985 to March, 1988, the accident rate on N.C. 127 was two to three times higher than the statewide average for comparable urban arterials throughout the state. This is a result of traffic capacity problems along the N.C. 127 traffic corridor (FAR 96, 97 and 98).

(38) Specifically, from 2nd Avenue to 8th Avenue the accident rate was 830 accidents per 100 million vehicle miles (FAR 96) as opposed to the statewide average of 312 for similar urban arterials. Similarly, from 8th Avenue to 16th Avenue (FAR 97), the accident rate was 998 accidents per 100 million vehicle miles as opposed to the statewide average of 312 for similar urban arterials; from 16th Avenue to 29th Avenue (FAR 98), the accident rate was 604 accidents per 100 million vehicle miles as opposed to the statewide average of 312 for similar urban arterials. This significant increase in accidents emphasizes the current need for substantial road improvements. As documented in the administrative record, failure to improve the geometrics on N.C. 127 will result in more traffic accidents, increased traffic capacity problems and additional traffic disruption to residential neighborhood streets.

(39) The Court finds as a fact that 127 has approached its capacity, that it must be improved, and that widening is the most prudent alternative.

(40) Since the approval of the FEIS, Defendants have continued to consider minimizing the harm to the 4(f) property (FAR 78).

## CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

As used hereinafter "FF" followed by a number refers to Findings of Fact number under "Findings of Fact."

The three issues before the Court in this case are:

(1) Did the Defendants comply with the requirements of Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. Section 1653(f) (re-codified as 49 U.S.C. Section 303) by concluding that there is no prudent and feasible alternative to using land protected under that Statute?

(2) If the answer to (1) is "Yes," then did the Defendants include all possible planning to minimize harm to the property used?

(3) Did the Defendants comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S. C. Section 4332?

*Section 4(f)*

As to the first issue, Title 49, Section 303 as applicable to this case states in essence that it is the policy of the Government that special effort should be made to preserve historic sites, and that the Secretary of Transportation (hereinafter "Secretary") shall cooperate and consult with the Secretary of the Interior, in developing transportation plans to maintain and enhance the natural beauty of lands crossed by transportation activities or facilities. Section 303(c) (which for convenience will be referred to as § 4(f) hereinafter) specifically states:

(c) The Secretary may approve a transportation program or project ... requiring the use of ... land of an historic site of national State or local significance (as determined by the Federal, State or local officials having jurisdiction over the ... site) only if—

(1) there is no *prudent* (emphasis added) and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from the use.

The Court's function is narrow. Its function is not to substitute its judgment for that of the Secretary, but to determine whether the Secretary acted within the scope of his authority in this case. *Maryland Wildlife Federation v. Dole,* 747 F.2d 229 (4th Cir.1984).

It must be kept in mind that Section 4(f) does not prohibit the use of the land protected by the statute. The Congressional intent as to the Secretary's scope of authority under Section 4(f) was expressed as follows:

> This amendment of both relevant sections of law is intended to make it unmistakably clear that neither section constitutes a mandatory prohibition against the use of enumerated lands, but rather, is a discretionary authority which must be used with both wisdom and reason. The Congress does not believe, for example, that substantial numbers of people should be required to move in order to preserve these lands, or that clearly enunciated local preference should be overruled on the basis of this authority.

H.Rep. No. 1799 90th Cong., 2nd Sess., *reprinted in 1968 U.S.Code Cong. & Admin.News,* 3531, 3538.

The scope of the Court's review to determine if the Secretary acted within the scope of his authority is set out in the Administrative Procedure Act, 5 U.S.C. § 706, the pertinent part of which provides:

> to the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall
>
> .    .    .    .    .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law
>
> .    .    .    .    .

(D) without observance of procedure required by law;

.    .    .    .    .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

■ First as to the term "arbitrary and capricious." "Arbitrary" is defined as meaning "done capriciously." It means depending on the will alone; absolutely in power. "Capricious" is defined as "seemingly unfounded motivation." "Arbitrary and Capricious," is the characterization of a decision or action taken by an administrative agency ... meaning willful and unreasonable action without consideration or in disregard of facts or without determining principle. "Abuse of discretion" is synonymous with a failure to exercise sound, reasonable and legal discretion—one that is clearly against logic and effect of such facts as are presented in support of the application or against the reasonable, and probable deductions to be drawn from the facts disclosed upon the hearing. *Black's Law Dictionary,* 5th Ed.

■ Under review provisions of this section "abuse of discretion" may be found only if there is *no* evidence to support decision *or* if decision is based on an improper understanding of the law. *Jaimez Revolla v. Bell,* 598 F.2d 243, 246 (C.A.D.C. 1979).

■ As pointed out in *Citizens to Preserve Overton Park, Inc. et al. v. Volpe, Secretary of Transportation, et al.,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970) and succeeding cases the scope of the Secretary's authority to approve a project using historic land is narrow and under the statute permits only two exceptions; *i.e.,* if there is no prudent and feasible alternative to using the land, *and* the program includes all possible planning to minimize harm to the historic site resulting from such use.

Just as the Secretary's scope of authority is narrow, so too is the Court's standard of review a narrow one. The Court is not

empowered to substitute its judgment for that of the agency. *Maryland Wildlife Federation v. Dole,* 747 F.2d 229, 234 (4th Cir.1984); *Virginia Growers Assoc. v. Donovan,* 774 F.2d 89 (4th Cir.1985).

■ The ultimate question for the Court is whether the agency took a hard look at all relevant factors, and used plain common sense in its determination as to whether the facts before the Secretary support his decision that there is no prudent and feasible alternative to the taking of some 4(f) property in this case for the project

> ... the court is "not [to] make the ultimate decision" but only to see "that the official or agency take a 'hard look' at all relevant factors." This is so because the power of judicial review in this area, is a narrow one to be applied within reason, and in essence is confined to a determination of whether the administrative decision "represented a clear error of judgment." In making such determination, the court is not to be led into construing the mandating statutes as a device to be used as "a crutch for chronic faultfinding" and, it is not to fault an agency for failure to consider "an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." Nor is the agency obligated "to consider in detail each and every conceivable variation of the alternatives stated;" it " 'need only set forth those alternatives "sufficient[ly]" to permit a reasonable choice.' " In sum, so long as the court, in its review, observes the rule of reason and practicality and takes a "hard look" at the relevant factors, it performs its obligation under the statutes.

*Coalition for Responsible Regional Development v. Coleman, et al.,* 555 F.2d 398, 400 (4th Cir.1977).

Of course, in reaching the decision the Secretary himself may have had little or nothing more before him than the recommendation of a subordinate. But the term "Secretary" in this context refers not merely to an individual but to an entire process of bureaucratic decisionmaking. The Secretary's subordinate relied on materials provided by federal administrators, environmental experts, engineers, biologists, government counsel and others. These individuals in turn delegated much of the task of developing the 4(f) Statement and its accompanying exhibits to state officials (as they are specifically authorized to do by 23 C.F.R. § 771.109(c)). *Wade v. Dole,* 631 F.Supp. 1100 (N.D.Ill.1986) (citations omitted).

■ In summary, the Secretary, through his subordinates in the bureaucracy, had before him the following:

(1) A clearly mandated need for improvement of Highway 127.

(2) In making his selection of the alternate to widen 127, (alternate) the Secretary had before him the voluminous and detailed State (SAR) and Federal (FAR) Administrative record.

(3) Alternate 1 (widening) would impact on § 4(f) property as follows:

(a) the District contains 14 pivotal buildings and 36 contributing buildings. Of these, only one contributing building (Clara Bell Fox structure) will be taken. No pivotal buildings will be taken, and the edge of the widened pavement will be moved closer to four contributing buildings and three pivotal buildings in the part of the CHD affected by the widening of 127.

(See Table II, and pp. 7, 8, 9 of FAR 64, as amended by the testimony). In summary, no pivotal buildings will be lost, only one contributing building will be lost, and the remaining, contributing and pivotal buildings will be affected by taking of a portion of the land on which the building is located for right-of-way (FF 14).

(b) Some trees will be lost, and though the number is a matter of dispute, it appears that 30 trees will be lost (FF 15).

(c) No land acquisition from any unique or vulnerable environmental features, such as parks and recreational areas will be affected (FAR 41A, p. 69).

(4) The FEIS (FAR 41A) which discussed the alternative routes in detail in the following language:

Other alternatives (other than the widening alternative) considered were: (1) a one-way pair arrangement (2A–2B) which would involve one-way traffic operations and affect access to the Shuford House but would not require Shuford House property and, (2) 3A and 3B, a relocation approximately 0.6 miles east of the Shuford House. The one-way pair arrangement was considered infeasible and imprudent because it would introduce major highway traffic into a stable and quiet residential neighborhood and result in traffic operational difficulties due to inadequate cross streets between the northbound and southbound legs of the one-way pair. A particularly significant problem in this respect would occur in the vicinity of the southern terminus of the southbound leg of the one-way pair where two 90 degree turns would be required to reach existing N.C. 127. The relocation of N.C. 127 to the east would cost a minimum of 5.6 million dollars more than the selected alternative and would be socially and environmentally more damaging than the selected alternative. Moreover, the estimated amount of traffic which would be diverted to a relocated N.C. 127 to the east was insufficient to negate the need for improvements to existing N.C. 127. The eastern alternatives too were considered infeasible and imprudent.

It was the determination of the N.C. Department of Transportation that there are no feasible *and* prudent alternatives to the use of this land and that all possible planning to minimize harm has been accomplished. (FAR 41A, p. 10 new).

(5) The Section 4(f) Statement which contained the following statement on page 9: Alternatives 2A and 2B would not use land from the 4(f) resource in that no houses in the Claremont High School Historic District would be removed or additional right-of-way required. However, both Alternatives 2A and 2B utilize not one, but two streets in the district-Center Street and 2nd Street N.E. An additional six houses in the district would be subjected to an increase in traffic noise and a slight impact on air quality due to the increased traffic volume on Center Street. (The one-way pair arrangement would introduce major highway traffic into a stable and quiet residential neighborhood an result in traffic operational difficulties due to inadequate cross streets between the northbound and southbound legs of the one-way pair.)

Center Street is the location of two hospitals—Hickory Memorial Hospital on Center Street between 2nd and 3rd Avenues and Frye Regional Medical Center on Center Street at 5th Avenue. Traffic flow patterns resulting from the one-way pair arrangement would limit the accessibility to the hospitals and, in addition, increase traffic volumes on cross streets through the Claremont High School Historic District. An increase in noise level and decrease in parking space for visitors also present serious problems for both facilities. A particularly significant problem, in terms of traffic operations, which occur in the vicinity of the southern terminus of the southbound leg of the one-way pair where two 90 degree turns would be required to reach existing NC 127.

Alternative 3A includes a new four-lane divided urban arterial highway approximately three-fourths mile east of existing NC 127. This facility will require a minimum 80–foot right-of-way. Alternative 3A begins on Highland Avenue at a point near its intersection with the Southern Railroad. From there it follows 8th Street N.E. in a northeasterly direction to 13th Avenue N.E. Then this alternative turns north and runs along the eastern boundary of Huntington Hills Golf Course and crosses 21st Avenue N.E. just west of 12th Street N.E. From this point the alternative continues northward crossing 29th Avenue in the vicinity of Fifth Street N.E. and then intersects with NC 127 in the vicinity of Cloninger Mill Road. This alternative would necessitate the partial widening and reconstruction of a portion of 8th Street N.E., but the majority of this alternative would contain new and relocated alignments.

Alternative 3B also includes a new four-lane divided urban arterial with a minimum 80–foot right-of-way to the east of NC 127. However, this alternative is to the west of the alignment outlined for Alternative 3A. From Highland Avenue near the Southern Railway tracks this alternative runs northward through the intersection of 8th Street N.E. and C Avenue, then crosses 9th Avenue N.E. and proceeds across open land to 5th Street N.E. near its intersection with 14th Avenue N.E. The alignment then generally follows 5th Street N.E. to 26th Avenue N.E. It then leaves 5th Street N.E. and proceeds northward across relatively open land to NC 127 near 41st Avenue N.E. From this point, the alternative follows the alignment of existing NC 127 to a point in the vicinity of Cloninger Mill Road. Under Alternative 3B, a portion of 5th Street and NC 127 from 41st Avenue to Cloninger Mill Road will be widened and reconstructed. However, the greater portion of the alignment will require new construction and relocation of existing streets.

Alternates 3A and 3B do not provide access to areas adjacent to NC 127, and according to trip destination data, will not significantly change traffic patterns to relieve the flow of traffic on NC 127. As a result, Alternatives 3A and 3B would not eliminate the need for improving the existing NC 127 corridor. In addition, Alternatives 3A and 3B necessitate new and relocated alignments which will result in the displacement or relocation of numerous residences and businesses.

Alternative 4 is described as the "postponement alternative". Under this plan minor improvements to the existing system could be implemented over a period of time, or the entire section of NC 127 could be improved, but staged so as to complete one section before going on to the next. The staged construction would occur over a long time span.

This project would involve the widening of approaches from all directions to the existing signalized intersections to include left turn storage lanes where needed, traffic responsive signal systems, and other interim improvements that can be made at these intersections to improve the capacity and safety of NC 127. This alternative would neither solve the problem of traffic flow between intersections nor the problem of access until the time for full implementation is reached. Then the cost would increase, and depending on what postponement date may be chosen, total construction costs of the facility would have increased significantly.

The "No Build Alternative", Alternative 5, implies that no new road construction of existing road improvements will take place. The "no build" condition does not preclude routine maintenance and improvements to NC 127.

This alternative would avoid any adverse impact on the historic property but would deny the public long term benefits of improved traffic operation and safety resulting from the proposed project. (FAR 64).

(6) The PCR as revised (SAR 175) (FAR 48).

(7) Agreed upon mitigation measures (SAR 175) and Memorandum of Agreement (MOA) by defendants and State Historic Preservation Officer (SHPO), setting forth the specific mitigation measures that would be implemented to minimize harm to the CHD, as well as Measures to Minimize Harm set forth in the final Sec. 4(f) Evaluation, (FAR 64).

(8) The endorsement of the Hickory Historic Properties Commission.

(9) A reevaluation of the Project on October 8, 1986 in compliance with NEPA requirements.

(10) Concurrence of the DOI with the NCDOT's and FHWA's conclusion as to the selection of the widening alternate steps to minimize harm to the CHD.

(11) Continuing efforts by NCDOT and FHWA to minimize harm to the CHD.

(12) Present and projected traffic.

(13) LOS calculations.

(14) Traffic accident data on the road.

(15) Support by City and County officials for the widening alternative.

(16) The 4(f) and FEIS statements.

In view of this elaborate Administrative Record, this Court cannot say that the Secretary through his subordinates, and the State administrators, environmental experts, government counsel and others did not base his consideration on relevant factors. This Court cannot say that the Secretary made a clear error of judgment, nor otherwise not act in accordance with law.

Nor can this Court say that the Secretary did not follow the necessary procedural requirements. Pursuant to the terms of Section 4(f), "[t]he Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed." 49 U.S.C. Section 303. The record indicates that the Secretary, through FHWA, fully cooperated and consulted with the Secretary of the Interior (DOI) regarding the N.C. 127 project inasmuch as DOI agreed with the FHWA's substantive Section 4(f) determination (FAR 64, Final Section 4(f) Appendix). Numerous documents indicate cooperation with the State of North Carolina.

Therefore, the Court finds that the choice approved by the Secretary was not arbitrary, capricious, or an abuse of discretion, and that he observed all procedures required by law. Having made these findings, the Court concludes that the Secretary's finding in concluding that there was no feasible and prudent alternative to the use of a part of the CHD property for this project (FAR 67) was within the scope of his authority and should be affirmed.

*Minimizing Harm to Section 4(f) Property*

Having found that the Secretary should be affirmed in his finding that there was no prudent and feasible alternative to the use of CHD land, the Court must next determine if the project included all possible planning to minimize harm to the CHD land.

The Court has previously alluded to the MOA that would be implemented to Minimize Harm (FAR 52), as well as, the Measure to Minimize Harm set forth in the Final Sec. 4(f) Evaluation (FAR 64), and feels that when considered with the testimony of defendants' witnesses, as to the ongoing changes being made, amply demonstrates that the project includes all reasonable possible planning to minimize harm to the District.

Specifically, relocation of the highway through another portion of the Section 4(f) area or through other Section 4(f) property must be considered as a means of minimizing harm. *Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 716 (11th Cir.1985). Accordingly, NCDOT and FHWA considered design alternative shifts as a means to minimize harm to the Claremont District.

For the preferred alternative, there are essentially two decision points with regard to minimization of harm to the Historic District. The decisionmaker's consideration and balancing of these decision points ultimately dictates which design shift minimizes harm to the protected site to the greatest extent practicable, while preserving the geometric efficiency and effectiveness of the facility to function properly, and to meet an acceptable level of service in the design year. The first decision point considers the shifting of the roadway between 2nd Avenue and just beyond 3rd Avenue as they intersect N.C. 127. The second decision point considers the shifting of the roadway between 4th Avenue and just beyond 5th Avenue with the intersection of N.C. 127.

A. *Decision Point One*

Beginning at N.C. 127 and 2nd Avenue (the southern terminus of the project), NCDOT and FHWA chose to construct the road improvements by fixing the eastern edges of the pavement at its existing location so as to: (1) avoid the use of land from Carolina Park; (2) avoid the taking of a pivotal house (Site # 9); (Site Numbers refer to Defendants' trial ex. 3) (3) to avoid the partial taking of a historic wall; and to (4) avoid the taking of a major non-historic wall improvement that is a significant visual feature of the Historic District. Conse-

quently, NCDOT and FHWA chose to widen entirely to the west, resulting in the taking of a contributing structure (Site # 49) and the reduction of a building setback on two pivotal structures (Sites # 10 and 28) and a contributing Structure (Site # 22) within the Historic District. This decision also results in the taking of a non-historic detached outbuilding (garage) from the Queen Anne Structure (Site # 10) and the resetting of an iron fence at Site # 28 within the District. Sidewalks were deleted along the eastern wall side of N.C. 127 between 2nd Avenue and 3rd Avenue to minimize the encroachment to the west side historic structures. The decisionmaker determined that this choice best minimized harm to the pivotal sites, and thus to the District as a whole.

### B. *Decision Point Two*

Beginning at 4th Avenue and proceeding north along N.C. 127 to the extreme northern boundary of the District (approximately 200 feet north of 5th Avenue Court), NCDOT and FHWA chose to widen N.C. 127 symmetrically. Symmetrical widening results in the taking of a non-contributing house (Site # 40) to avoid the taking of a contributing house (Site # 17), and results in additional setback encroachment on the pivotal structure (Site # 1).

Although the decisionmaker recognized that the choice to symmetrically widen results in additional setback encroachment on a contributing property (Site # 27) and the removal of a modern non-historic fence from another contributing house (Site # 13), John S. Humeston Environmental Manager, FHWA, considered these impacts less significant than further encroachment on the Maple Grove property; that property is a pivotal structure owned and maintained by the Hickory Landmark Society. If N.C. 127 were widened entirely to the east rather than symmetrically, this would result in the taking of a contributing structure (Site # 17) and a substantial reduction of setback to the pivotal structure. If N.C. 127 were widened entirely to the west, this would result in the taking of a non-contributing structure (Site # 40) in addition to

eleven additional residential structures and two businesses.

### *Minimization of Harm Measures*

Because of the nature of the N.C. 127 traffic corridor, the preferred alternative requires the removal of mature trees regardless of design shifts. NCDOT and FHWA have incorporated all possible planning to minimize the taking of trees, but balanced the taking of the trees against the need to build a facility that will adequately serve the transportation needs of the community (SAR 260, 263, 271, 290).

As a result of this planning effort and the considerable input from concerned citizens, the following minimization measures were agreed upon:

(1) Landscaping in a manner compatible with the District's era and appearance;

(2) Lane width reduction within the District;

(3) Cross-section reduction;

(4) Reduction of utility intrusion along N.C. 127;

(5) Tree and plant replacements consistent with the District's character and time period;

(6) Resetting a non-structural element of the District (iron fence);

(7) Recording and documenting historical qualities and features of structures in the District;

(8) Preservation efforts of the contributing structure being displaced by the project (Site # 49);

(9) Preservation of existing vertical alignment so as to minimize disruption/impacts to adjacent properties; and

(10) Elimination of sidewalks to reduce encroachment on a pivotal structure.

(Final 4(f) Evaluation, pp. 10–13) (FAR 52 and 86) (SAR 217).

The Court concludes that the Project includes all possible planning to minimize harm to the CHD.

### NEPA–FEIS

Plaintiff's primary objections to the FEIS (FAR 47A) are twofold. First, Plaintiff

challenges the need and purpose of the project as set forth in the FEIS by alleging the insufficiency of the traffic and safety data to justify the widening improvements but does not produce any evidence to the contrary. Secondly, Plaintiff alleges that the FEIS is defective because it: (a) fails to adequately consider reasonable alternatives to the preferred action, especially in view of impacts to the Claremont District; (b) failed to adequately analyze project impacts by alternative; and (c) failed to disclose sufficient information for the public to comment. Collateral to these arguments, Plaintiff avers that the FEIS is stale, and, therefore, an SEIS is warranted. Defendants contend that these allegations are without merit. Section 102(2)(C) of NEPA (42 U.S.C. § 4332(c)) requires that an EIS contain a "detailed statement" by the responsible official on—

   (i)   the environmental impact of the proposed action;

   (ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented;

   (iii) alternatives to the proposed action;

   (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

   (v)  any irreversible and irretrievable commitments of resources which would be involved should the proposed action be implemented.

42 U.S.C. Section 4332(2)(C).

Although NEPA established some "significant substantive goals for the Nation," the obligations it imposes on agencies such as the Defendants herein are "essentially procedural." *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam) *citing Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460. ■ In carrying out these procedural obligations to consider and inform, there is no obligation to "elevate environmental concerns over other appropriate considerations;" [NEPA] require[s] only that once an

agency has made a decision subject to NEPA's procedural grounds, the only role for this Court is to insure that the agency has considered the environmental consequences. *Stryckers's Bay,* 444 U.S. at 227, 100 S.Ct. at 500, and the entire environmental impact statement process is to be judged by the "rule of reason." *Maryland Wildlife Federation v. Dole,* 747 F.2d at 241.

■ NEPA is to insure a fully informed and well considered decision, not necessarily a decision this Court would have reached had it been a member of the decision-making agency. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460.

■ Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable to man. *Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215.

*The Draft and FEIS Disclosed All Reasonable Alternatives Compared All Reasonable Alternatives To the Preferred Alternative, and Disclosed the Government's Rationale as to Why Each Rejected Alternative Was Unreasonable*

■ NEPA specifically requires an EIS to contain a detailed statement of alternatives to the proposed action. The alternative section ensures that the decisionmaker has adequately considered other means to achieve the desired transportation objective. *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d at 712 (11th Cir.1985), *citing Sierra Club v. Morton,* 510 F.2d 813, 825 (5 Cir.1975). This consideration of alternatives forces the highway agencies to fully evaluate the environmental effects of each alternative proposal as compared to the impacts of the preferred alternative. *Druid Hills,* 772 F.2d at 712 *citing Piedmont Heights Civic Club Inc. v. Thomas D. Moreland,* 637 F.2d 430, 436 (5 Cir.1981). However, con-

sideration need only be given to reasonable alternatives "bounded by some notion of feasibility." *Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215. An EIS is satisfactory if the treatment of alternatives, when judged against a "rule of reason," is sufficient to permit a reasoned choice among the various options. *Druid Hills,* 772 F.2d at 713.

■ In the case at bar, alternatives were chosen based upon the stated transportation objective to improve the traffic capacity and safety operations of N.C. 127. Traffic models were used to identify build alternatives that could reasonably address the transportation objective.

The FEIS (FAR 41A) was approved on August 11, 1977 and distributed to interested parties. The FEIS contained over 100 pages of text, including analyses, bibliographies, charts, and environmental, social and economic conclusions. The appendices contained *inter alia* comments and responses, analyses and Section 4(f) evaluations.

The FEIS identified the reasonable build alternatives as follows: the preferred alternative of widening, one-way pairs using either North Center Street or 1st Street, an eastern route on new location, and a middle route on new location. The draft and final EIS also discussed the alternatives of postponement with minor road improvements and the no build. The no build and postponement alternatives were rejected since they did not reasonably fulfill the transportation objective of the stated project.

Additionally, the middle and eastern bypasses were rejected since they also did not respond to the traffic objective in the N.C. 127 corridor. Moreover, since the Hickory network model substantiated approximately 27,100 ADT in the Historic District would require use of N.C. 127 in the design year, notwithstanding the existence of a bypass, the middle and eastern bypasses were clearly deemed unreasonable.

The two one-way pair combinations were also rejected in favor of the widening alternative since both of these alternatives would introduce impacts out of character with the neighborhood setting. Traffic conflicts and noise impacts on Hickory's

hospitals and residences further reduced the utility of this combination of alternatives.

The widening alternative was the preferred alternative since it met the stated transportation objective and was sensitive to the environment; N.C. 127 was already an established transportation corridor.

The FEIS addressed the concerns of citizens and responded to agency comments on the DEIS. Moreover, the administrative record was kept open to consider and respond to any later design hearing comments. The decisionmaker weighed and balanced the information before him as required by NEPA and within the procedural guidelines of the agency. Therefore, his decision was reasonable and supported by the administrative record.

■ NEPA requires the government to only consider public comments. There is no obligation to implement citizen proposals, or even resource agency proposals; however, prudent comments and suggestions are incorporated into the project design to the extent practical. Commenting agencies do not have veto power over the Secretary's decision nor can they eliminate the power of the Secretary to give greater weight practical. *Maryland Wildlife Federation v. Dole,* 747 F.2d at 238.

*An SEIS is Not Required for This Proposed Project*

Plaintiff contends that Defendants' EIS is stale, and an SEIS should be prepared, because Defendants' EIS is more than ten years old, and it allegedly does not reflect the changed circumstances of the District.

23 C.F.R. 771.129 (Pl.Ex. 25) in pertinent part states:

(2) If major steps to advance the action (e.g., authority to acquire a substantial portion of the right-of-way, or approval of the plans, specifications and estimates) have not occurred within 3 years from the date the FEIS or FEIS supplement was approved, the Administration in cooperation with the applicant shall prepare a written evaluation of the FEIS before further approval may be granted.

If there have been significant changes in the proposed action, the affected environment, the anticipated impacts, or proposed mitigation measures, a new or supplemental EIS shall be prepared and circulated.

In compliance with 23 C.F.R. 771.129 the NCDOT, by letter dated October 8, 1986, stated it had reevaluated the project and made the following determination:

After a review of the Final Environmental Impact Statement and a field investigation of the recommended improvements, it is the conclusion of the North Carolina Department of Transportation that no significant changes have occurred in the proposed action or project area. The proposed action as recommended in the FEIS is to be implemented and right of way plans are being finalized based on these recommended improvements.

Since the approval of the FEIS, the State Historic Preservation Officer has identified a historic district, the Claremont High School Historic District, in the project area. A Draft Section 4(f) Evaluation has been prepared addressing the project's effect on the Claremont High Historic District which is included in the National Register of Historic Places. The Draft Section 4(f) Evaluation contains a Memorandum of Agreement detailing the mitigation measures to be incorporated into the project. Coordination with State Historic Preservation Officer has been carried out and necessary compliance with Section 106 of the National Historic Preservation Act has been undertaken.

The proposed project was reviewed in the field in May, 1986 to reevaluate potential impacts on biological communities and wetland infringement. The ecological survey revealed that landscape plants and trees associated with businesses, residences and churches occur throughout the project area. A small drainage area located midway through the project was noted. However riparian species typical of wetland communities were absent. The crossing involved with the project is classified as a "minor road crossing" and

is authorized by the Corps of Engineers nationwide permit.

Since this project involves linear widening through an area committed to urban development, the project is not subject to the provisions of the Farmland Protection Policy Act.

According to criteria set forth in 23 CFR Part 771.129, it is the conclusion of the North Carolina Department of Transportation that the approved Final Environmental Impact Statement is still valid. This reevaluation has been discussed with your staff and they concur with the findings.

(FAR 55) (FF 21).

The FHWA concurred that the reevaluation was satisfactory and that an SEIS was not required. (FAR 58, FF 21).

The Section 4(f) statement specifically addressed the projects effect on the CHD. (FF 21).

■■■■■ The decision whether to supplement an EIS is committed largely to the discretion of the lead agency, here FHWA. In reviewing an agency's determination not to prepare an SEIS, a court should apply the same standard of judicial review that it would apply to a determination not to prepare an EIS in the first instance, namely, whether the decision was made on a rational basis. *Wisconsin v. Weinberger*, 745 F.2d 412, 417 (7th Cir.1984).

■■■■ An SEIS does not have to be prepared every time new information becomes available; rather, a supplemental EIS is only required where new information has environmental significance. 23 C.F.R. Section 771.130(a) (1987). The FHWA regulations specifically state that "[s]upplements will be necessary when there have been *significant changes* in the proposed action, the affected environment, the anticipated impacts, or the proposed mitigation measures." 23 C.F.R. Section 771.130(a) (1987) (emphasis added).

■■■■■ Thus, the legal standard for determining the necessity for an SEIS is whether there has been a significant changed circumstance that was not contem-

plated in the original environmental documents. In the case at bar, the administrative record adequately reflects the reevaluation of environmental conditions. NCDOT completed a biological and wetlands assessment and ecological survey (SAR 148) (FF 17). Based upon this field survey, other reports and inspections, and on-site visitations, NCDOT prepared and submitted a written reevaluation of the project to the FHWA; NCDOT concluded that there had been no significant change in the environment that was not originally contemplated in the previous environmental documents (FAR 55).

FHWA independently assessed NCDOT's findings and conclusions and on November 3, 1986 concurred that an SEIS was not required (FAR 58). Even if more detail could have been provided or other studies performed or updated, the Defendants' decision that an SEIS was not required is reasonable inasmuch as there has not been a significant environmental change warranting an SEIS.

The fact that the FEIS was prepared more than ten years ago does not *per se* require preparation of an SEIS in the absence of significantly changed conditions or circumstances. For example, the air quality analysis contained in the FEIS disclosed that the air quality projections for the project were well below established EPA standards. Even though this analysis was not updated, this does not suggest that air quality is any more significant now than it was then (SAR 63). Similarly, the methodology employed to study noise quality also has not changed since that study was completed in the original EIS. Because noise abatement was never a factor, there is no compelling reason to doubt or update these noise findings.

The only noteworthy change in the project corridor was the nomination of the Claremont District to the National Register. Satisfactory compliance with the later NEPA, Section 106 (Historic Preservation) and Section 4(f) regulations ensured that proper attention and consideration was given to the District. Knowing that the area had not changed significantly, that

impacts would be relatively the same, and that no new mitigation measures had been discovered, the decisionmaker was not unreasonable in not requiring a supplemental EIS for the N.C. 127 project.

The Court concludes that NEPA requirements have been met for the proposed N.C. 127 widening project, the road improvements are justified now and in the future from a traffic capacity and accident standpoint, and a hard look at reasonable alternatives and the weighing of resulting environmental impacts have been completed with objective good faith. Therefore, the procedural requirements of NEPA have been fulfilled since the ultimate choice of action is vested with the decisionmaker. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

None of Plaintiff's "experts" had read all the documents, or made more than a superficial study of the project, had never made their views known to the decisionmaker before trial and in fact had made their determinations and drawn their conclusions strictly for this trial. The Court concludes that their testimony should be afforded little weight.

Each party shall bear their own costs, including attorney's fees.

Any Finding of Fact which is determined also to be a Conclusion of Law is so deemed and any Conclusion of Law which is determined also to be a Finding of Fact is so deemed.

In conclusion, the Court finds that Defendants have complied fully with the Department of Transportation Act, 49 U.S.C. Section 303 (Sec. 4(f)), and NEPA, 42 U.S.C. Section 4332(2)(c), and the regulations issued pursuant thereto and the Court will file a Judgment simultaneously with this Memorandum of Decision denying injunctive relief and dismissing Plaintiff's action.

## JUDGMENT

THIS MATTER coming on to be heard and being heard by the undersigned, and the issues having been duly tried and a

Memorandum of Decision having been filed simultaneously herewith;

NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED:

(1) That Plaintiff's prayer for injunctive relief is DENIED;

(2) That Plaintiff's action is DISMISSED on the merits; and

(3) That each side pay its own costs.