**HICKORY NEIGHBORHOOD DEFENSE LEAGUE, Plaintiff,**

v.

**Samuel K. SKINNER, Secretary of Transportation; Ray A. Barnhardt; James E. Harrington; and George E. Wells, Defendants.**

**No. C–C–88–195–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

Feb. 27, 1990.

Michael S. Scofield, Mary V. Carrigan, Charlotte, N.C., for plaintiff.

Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., James E. Scapellato, Federal Highway Admin., Atlanta, Ga., and James B. Richmond, Sp. Deputy Atty. Gen., Raleigh, N.C., for defendants.

Elizabeth Sherrill Merritt, Seattle, Wash., (David A. Doheny, Vice President & Gen. Counsel, Andrea C. Ferster, Asst. Gen. Counsel, Nat. Trust for Historic Preservation in the U.S., Washington, D.C., on brief), for amicus curiae.

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on remand from the United States Court of Appeals for the Fourth Circuit. *See Hickory Neighborhood Defense League v. Skinner,* 893 F.2d 58 (4th Cir.1990). On remand, this Court has directed the parties to file supplemental briefs and has allowed the National Trust for Historic Preservation to file a brief as an *amicus curiae.*

Plaintiff Hickory Neighborhood Defense League (HNDL) originally filed this action seeking to enjoin the proposed widening project of North Carolina Highway 127 (hereafter "N.C. 127"). *See Hickory Neighborhood Defense League v. Burnley,* 703 F.Supp. 1208, 1210 (W.D.N.C.1988). N.C. 127 is a principal north/south urban arterial highway in Hickory and is the only principal north/south urban arterial serving the City of Hickory. *Id.* at 1211. The proposed widening of N.C. 127 would require the use of historic property in the Claremont Historic District (CHD). *Id.* at 1211–12. HNDL's allegations in its Complaint raised, among other things, whether the Secretary of the United States Department of Transportation and the other Defendants (hereafter collectively "the Secretary") complied with section 4(f) of the Department of Transportation Act of 1966, codified as amended at 49 U.S.C. § 303(c) (1982) (hereafter "§ 4(f)"). *Id.* at 1211. After the conclusion of a trial on the merits, this Court made detailed Findings of Fact and Conclusions of Law and entered a Judgment. *See id.* at 1211–27. In entering a Judgment, this Court denied HNDL's request for injunctive relief and dismissed HNDL's claims on the merits. *Id.* at 1228.

On appeal, the Fourth Circuit affirmed in part and vacated in part this Court's decision. *Hickory Neighborhood,* 893 F.2d at 63. In its opinion, the Fourth Circuit stated that "the district court should have determined whether the Secretary found that the proposed alternatives were not 'prudent' as defined by *Overton Park." Id.* at 62. The Fourth Circuit vacated this Court's decision that the Secretary complied with § 4(f). *Id.* The Fourth Circuit also remanded this matter to this Court to make findings:

(1) Whether the Secretary determined that the alternatives to the proposed widening of N.C. 127 were not prudent in light of *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); and

(2) If the Court determines that the Secretary determined that the alterna-

tives were not prudent under *Overton Park*, whether the facts before the Secretary supported his determination.

*Id.* The Fourth Circuit, moreover, stated that if this Court determines on remand that the Secretary complied with *Overton Park* in rejecting the alternatives as imprudent, this Court does not need to consider whether the Secretary compared the impact to the § 4(f) land from an alternative against the impact to the § 4(f) land from the proposed project. *Id.* at 62.

The Court now will comply with the Fourth Circuit's orders. The Court, however, will not repeat its previous Findings of Fact and Conclusions of Law, except as necessary to assist in the understanding of this Memorandum. As ordered by the Fourth Circuit, the Court will make additional findings, supported by the administrative record and the trial transcript, concerning the two primary issues on remand.

## I. SUMMARY OF CITIZENS TO PRESERVE OVERTON PARK v. VOLPE

The Fourth Circuit has directed this Court to consider the United States Supreme Court's decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In *Overton Park*, the United States Supreme Court succinctly summarized the facts as follows:

> Overton Park is a 342–acre city park located near the center of Memphis. The park contains a zoo, a nine-hole municipal golf course, an outdoor theater, nature trails, a bridle path, an art academy, picnic areas, and 170 acres of forest. The proposed highway, which is to be a six-lane, high-speed, [sic] expressway, will sever the zoo from the rest of the park. Although the roadway will be depressed below ground level except where it crosses a small creek, 26 acres of the park will be destroyed. The highway is to be a segment of Interstate Highway I–40, part of the National System of Interstate and Defense Highways. I–40 will provide Memphis with a major east-west expressway which will allow easier access to downtown Memphis from the resi-

dential areas on the eastern edge of the city.

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 406–07, 91 S.Ct. 814, 818–19, 28 L.Ed.2d 136 (1971) (footnotes omitted). Thus, in *Overton Park*, the proposed highway would sever a portion of the park from the remaining portion and would destroy twenty-six acres of the park.

In *Overton Park*, the Supreme Court recognized that the "protection of § 4(f) parkland was to be given paramount importance." *Id.* at 412, 91 S.Ct. at 821. The Supreme Court acknowledged, further, that § 4(f) land was "not to be lost unless there were truly unusual factors present in a particular case *or* the cost *or* community disruption resulting from alternative routes reached extraordinary magnitudes." *Id.* at 413, 91 S.Ct. at 822 (emphasis added). The *Overton Park* Court noted also that the Secretary could not authorize "the *destruction* of § 4(f) property unless he finds that alternative routes present *unique* problems." *Id.* at 413, 91 S.Ct. at 822 (emphasis added).

This Court, however, is of the opinion that the facts in *Overton Park* are far different than the facts in the case before the Court. In the case before this Court, although the CHD contains fourteen pivotal buildings and thirty-four contributing buildings, N.C. 127 passes through a portion of the CHD containing only five pivotal buildings, five contributing buildings, and one non-contributing building. *Hickory Neighborhood*, 703 F.Supp. at 1212. Further, the proposed widening of N.C. 127, which is a 4.6 mile-long project, impacts only six-tenths of a mile of the abutting CHD. *Id.* at 1215. Moreover, the proposed project will result in the taking of the *one non-contributing* house, which is the Ball house (Inventory No. 40), and *only one contributing* house, which is the Fox Heirs house (Inventory No. 49). *Id.* at 1213. Two pivotal houses, which are the McCall house (Inventory No. 53) and the Belmore house (Inventory No. 9) will not lose any land. *Id.* The proposed project will result in a condemnation of a portion of the land on which the four remaining

contributing houses and the three remaining pivotal houses are located. *Id.* Based upon all of these previously-determined facts, the Court believes that the proposed project in the case before the Court in no way will destroy the § 4(f) land, in sharp and direct contrast to the proposed project's destruction in *Overton Park* of twenty-six acres of § 4(f) parkland.

## II. A REVIEW OF THE ALTERNATIVES TO WIDENING N.C. 127

### A. Alternatives 2A and 2B

Alternatives 2A and 2B to the proposed widening of N.C. 127 (hereafter "the one-way pair arrangement") consist of the proposed development of a one-way pair of roads using N.C. 127 as one leg of the one-way pair of roads. *Id.,* at 1220. The one-way pair arrangement accordingly would utilize not one, but two streets in the CHD. *Id.* The one-way pair arrangement also would subject six additional houses in the CHD to an increase in traffic. *Id.* The anticipated cost of Alternative 2A was approximately $8.4 million, and the anticipated cost of Alternative 2B was approximately $9.8 million. Federal Administrative Record (FAR) 64, p. 4 (Final § 4(f) Evaluation).

The selection of the one-way pair arrangement, further, would have several consequences. The federal decision-maker considered both the individual and cumulative impacts of these consequences. Trial Transcript (hereafter "Tr. Trans."), p. 660. First, the one-way pair arrangement negatively would impact the two hospitals located on Center Street. Hickory Memorial Hospital is located on Center Street between 2nd and 3rd Avenues, and Freye Regional Medical Center is located at Center Street and 5th Avenue. *Hickory Neighborhood,* 703 F.Supp. at 1220. The one-way pair arrangement would result in traffic flow problems and would limit access to the two hospitals located on Center Street. *Id.*

Second, the one-way pair arrangement would introduce major highway traffic into a stable, quiet residential neighborhood unaccustomed to such traffic. *Id.* The introduction of additional truck, automobile, and motorcycle traffic and the accompanying noise and air pollution would be detrimental to almost any residential neighborhood. Tr. Trans., p. 243.

Third, according to the appendix to the Final § 4(f) Evaluation, the one-way pair arrangement would require significant construction, including a grade separation and interchange, to tie the one-way street into N.C. 127 at the northern end of the one-way pair arrangement. Tr. Trans. pp. 658–59; FAR 64, p. 9. This additional construction would result in either residential or commercial displacement. Tr. Trans. p. 659.

Fourth, the one-way pair arrangement would create a significant problem in terms of traffic operations. *Hickory Neighborhood,* 703 F.Supp. at 1220. At the southern terminus of the south-bound leg of the one-way pair, two ninety-degree turns would be required to reach existing N.C. 127. *Id.* Additionally, the one-way pair arrangement would increase traffic volume on cross-streets through the CHD between the northbound and southbound legs of the one-way pair arrangement. *Id.* The Final § 4(f) Evaluation, however, referred to the cross-streets as being inadequate. FAR 64, p. 9.

In addition to all of these factors common to Alternatives 2A and 2B, Alternative 2B would cause more neighborhood disruption than Alternative 2A because of the existing street network's present inability geometrically to accommodate traffic without major alignment improvements to neighborhood streets. Tr. Trans. p. 659.

### B. Alternatives 3A and 3B

Alternatives 3A and 3B involve the construction of two four-lane divided highways. Alternative 3A consists of a new four-lane, divided, urban, arterial highway approximately three-fourths of a mile east of existing N.C. 127. *Hickory Neighborhood,* 703 F.Supp. at 1220. Alternative 3A would require a minimum right-of-way of eighty feet. *Id.* Alternative 3B also consists of a new four-lane, divided, urban,

arterial highway requiring a minimum eighty-foot right-of-way to the east of N.C. 127. *Id.* at 1221. The highway proposed in Alternative 3B, however, is to the west of the highway proposed in Alternative 3A. *Id.*

Despite the existing need to improve traffic along N.C. 127 in Hickory,[1] Alternatives 3A and 3B would not provide access to areas adjacent to N.C. 127 and, according to trip destination data, significantly would not change traffic patterns to relieve the flow of traffic on N.C. 127. *Id.* Alternatives 3A and 3B, consequently, would not eliminate the need for improving the existing N.C. 127 corridor. *Id.* Alternatives 3A and 3B, additionally, would necessitate new and relocated alignments resulting in the displacement or relocation of numerous residences and businesses. *Id.*

In addition to failing to meet the transportation need, the anticipated cost of Alternative 3A was approximately $25.5 million. FAR 64, p. 4. The anticipated cost of Alternative 3B was $22.1 million. FAR 64, p. 5. Thus, the anticipated cost for Alternative 3A or Alternative 3B was almost three times the $8.4. million anticipated cost of Alternative 2A and the anticipated $9.8 million cost of Alternative 2B. Further, the anticipated cost for Alternative 3A or Alternative 3B was nearly twice the anticipated $14 million cost of the proposed widening of N.C. 127. FAR 64, p. 3.

### C. Alternative 4

Alternative 4, described as the "Postponement Alternative," consisted of the making of minor improvements to the existing traffic system in various stages over a long period of time. *Hickory Neighborhood,* 703 F.Supp. at 1221. Alternative 4, however, would not solve the problem of traffic flow between intersections or the problem of access until fully implemented.

*Id.* Further, costs would increase and, depending on what postponement date was selected, the total construction costs of the facility would have increased significantly. *Id.*

### D. Alternative 5

Alternative 5, the "No Build Alternative," implies that no new road construction would occur. *Id.* Alternative 5 would avoid any adverse impact on the historic property, but would deny the public the long term benefits of improved traffic operation and safety resulting from the proposed project. *Id.*

### III. APPLICABLE LAW

#### A. Section 4(f)

Section 4(f) specifically provides in pertinent part:

(c) The Secretary may approve a transportation program or project ... requiring the use of ... land of an historic site of national, State, or local significance (as determined by the Federal, State or local officials having jurisdiction over the ... site) only if—

(1) there is no *prudent* and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from the use.

49 U.S.C. § 303(c) (1982) (emphasis added). Section 4(f), thus, does not prohibit the use of the land protected by the statute. *See id.* Under § 4(f), the Secretary may recognize that it would be prudent in some circumstances to use § 4(f) protected land. *See Eagle Found., Inc. v. Dole,* 813 F.2d 798, 805 (7th Cir.1987) (stating that "the Secretary must start with a strong presumption against turning chlorophyll cloverleafs in the parks into concrete ones;

---

**1.** HNDL did not challenge the need for traffic improvements, but, instead, conceded that N.C. 127 was inadequate. Tr. Trans. pp. 161, 175–176; Tr. Trans. p. 283. Additionally, both city and county officials consistently have supported the widening of N.C. 127. *Hickory Neighborhood,* 703 F.Supp. at 1211. Moreover, despite also nominating the CHD to the National Reg-

ister, the Hickory Historic Properties Commission recognized the serious traffic problems existing on N.C. 127 and endorsed the widening of N.C. 127 to upgrade the major north/south traffic artery in Hickory. *See id.* at 1212 (quoting letter dated November 23, 1984, from Hickory Historic Properties Commission to North Carolina Department of Transportation).

but even after starting from this presumption it may be prudent to use the Section 4(f) land"). Congress, however, intended to narrow the scope of the Secretary's authority in considering projects impacting § 4(f) land:

> This amendment ... is intended to make it unmistakably clear that neither section constitutes a mandatory prohibition against the use of enumerated lands, but rather, is a discretionary authority which must be used with both wisdom and reason. The Congress does not believe, for example, that substantial numbers of people should be required to move in order to preserve these lands, or that clearly enunciated local preference should be overruled on the basis of this authority.

H.Conf.Rep. No. 1799, 90th Cong., 2nd Sess., *reprinted in* 1968 U.S.Code Cong. & Admin.News, 3482, 3531, 3538; *see Hickory Neighborhood*, 703 F.Supp. at 1218.

### B. The Standard of Review

■ In *Overton Park*, the Supreme Court established the standard of review for courts reviewing the Secretary's § 4(f) decisions. *Overton Park*, 401 U.S. at 415–17, 91 S.Ct. at 823–24. Under *Overton Park*, lower courts should give the Secretary's decision the presumption of regularity to which it is entitled. *Id.* at 415, 91 S.Ct. at 823. The presumption of regularity, however, should not shield the Secretary's action from "a thorough, probing, in-depth review." *Id.* Courts, first, have the duty to determine whether the Secretary properly construed his authority and acted within the scope of his authority. *Id.* at 415–16, 91 S.Ct. at 823. Courts, then, have the duty to determine "whether the actual choice by the Secretary was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.; Maryland Wildlife Fed'n v. Dole*, 747 F.2d 229, 234 (4th Cir.1984). In fulfilling this second duty, courts must consider whether in making the decision, the Secretary considered the relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823; *Maryland Wildlife Fed'n*,

747 F.2d at 234. Although a court's inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

In reviewing the Secretary's decision, the court fulfills its obligation by observing the rule of reason and practicality. *Coalition for Responsible Regional Dev. v. Coleman*, 555 F.2d 398, 400 (4th Cir.1977). A court, however, does not have the authority to substitute its judgment for the judgment of the agency. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. A court, thus, is not to make the ultimate decision, but only must ensure that the Secretary took a "hard look" at all relevant factors. *Coalition for Responsible Regional Dev.*, 555 F.2d at 400. In considering the Secretary's decision, a "court is not to be led into construing the mandating statutes as a device to be used as a 'crutch for chronic faultfinding.'" *Id.*

The United States Court of Appeals for the Seventh Circuit succinctly has summarized the appropriate role that courts should take in reviewing the Secretary's § 4(f) decision. In *Eagle Found., Inc. v. Dole*, the Seventh Circuit stated that:

> The "probing" inquiry ensures that the court learns what is going on and does not decide on the basis of superficial beliefs and assumptions; the deferential review ensures that once the court is satisfied that the Secretary took a close look at the things that matter and makes the hard decisions, those decisions stick. The court's role is to find out whether the Secretary considered what she had to consider, put out of mind what she was forbidden to consider, and dealt rationally with the competing relevant issues.

*Eagle Found.*, 813 F.2d at 803.

### IV. DISCUSSION

The Court believes that it has made the probing inquiry mandated by the Supreme Court in *Overton Park*.

### A. The Secretary's Authority

Although not a specific issue on remand, the Court believes that the Secretary prop-

erly construed his authority and acted within the scope of his authority. *See Hickory Neighborhood,* 703 F.Supp. at 1222.

The Secretary also has provided the Court with a copy of the Secretary's Section 4(f) Policy Paper (hereafter "the Policy Paper") containing the current relevant administrative positions in considering § 4(f) issues. *See* Exhibit A, Defendants' Supplemental Proposed Findings of Fact and Conclusions of Law, filed February 14, 1990. The Policy Paper, dated September 24, 1987, and revised June 7, 1989, reflects that in considering § 4(f) issues, the Secretary initially presumes that § 4(f) land should not be used unless the Secretary determines that any alternative which would avoid using § 4(f) land would result in unique problems. Moreover, the Secretary has formulated a policy requiring any decision to build a highway through § 4(f) land to be subjected to a thorough, probing, and in depth review as required by the Supreme Court's *Overton Park* decision.

The Secretary also has provided the Court with a document entitled "Guidance for Preparing and Processing Environmental and Section 4(f) Documents" (hereafter "the Guidance Statement") and an affidavit of Mr. Harter M. Rupert, Jr. *See* Exhibits B and C, Defendants' Supplemental Proposed Findings of Fact and Conclusions of Law, filed February 14, 1990. The Court will accept the Policy Paper, the Guidance Statement, and Rupert's affidavit under Rule 201 of the Federal Rules of Evidence. *See* F.R.Evid. 201 (authorizing trial court to take judicial notice of adjudicative facts).

Based on this Court's Findings of Fact in its previously-issued and published opinion and the additional findings in this Memorandum, the Court again concludes that the Secretary properly construed his authority to approve the use of the § 4(f) land to situations in which the feasible alternative routes were not prudent.

*B. The Secretary's Determination That The Alternatives Were Not Prudent*

The Court believes that in reaching his decision, the Secretary determined that the Alternatives to the proposed widening of N.C. 127 were not "prudent" as defined by *Overton Park.*

■ First, this Court believes that the statutory language of § 4(f) is clear. Although the Supreme Court in *Overton Park* stated that the Secretary could not authorize "the *destruction* of § 4(f) property unless he finds that alternative routes present *unique* problems," this Court is firmly convinced that the Supreme Court in *Overton Park* merely was being emphatic by using the term "unique," but did not intend to substitute the term "unique" for the term "prudent" in the text of § 4(f). *See Eagle Found.,* 813 F.2d at 804–05 (concluding that Supreme Court in *Overton Park* was being emphatic with use of term "unique"). Black's Law Dictionary defines the term "prudent" as "practically wise, judicious, careful, discreet, circumspect, *sensible." Black's Law Dictionary* 1104 (5th Ed.1979) (emphasis added). Webster's Dictionary of the English Language defines the term "unique" as "one of a kind, not like anything else of its kind, incomparable, rare, unusual." *Webster's Dictionary of the English Language* 1076 (1989). Based upon these definitions, this Court is left with little doubt that by using the word "unique," the Supreme Court in *Overton Park* must have been using it for emphasis and surely not as a substitute for the term "prudent" in the statute. This Court believes that by using the term "unique," the *Overton Park* Court simply attempted clearly to show that the justifications for using § 4(f) land needed to be compelling. *See Eagle Found.,* 813 F.2d at 805 (stating that "reasons for using protected land have to be good ones, pressing ones, well thought out").

This Court, therefore, will consider whether the Secretary determined that Alternatives 2A, 2B, 3A, 3B, 4 ("Postponement Alternative"), and 5 ("No Build Alternative") were not sensible, rather than presenting one of a kind or rare problems. In the Final § 4(f) Evaluation, the Secretary concluded that "there is no feasible and prudent alternative to the use of land from the Claremont High School District and that the proposed action includes all

possible planning to minimize harm to this Section 4(f) property resulting from such use." FAR 64, p. 13. This Court previously has affirmed the Secretary's decision. *Hickory Neighborhood*, 703 F.Supp. at 1222.

■ On remand, however, HNDL contends that the Fourth Circuit specifically found that "the administrative record does not indicate that the Secretary determined that there were unique problems or that the disruption associated with the alternatives reached extraordinary magnitudes." *See Hickory Neighborhood*, 893 F.2d 58, 61. HNDL essentially argues, therefore, that because the Secretary's Final § 4(f) Evaluation fails to demonstrate an implicit or explicit recognition of the *Overton Park* standard, but rather rejects the Alternatives in a cursory and conclusory fashion, the Court must remand this matter to the Secretary.

The Court finds no merit in HNDL's argument. The Court believes that the Secretary's failure specifically to refer to the *Overton Park* standard is not fatal to his decision for several reasons. First, the language of § 4(f) does not require the Secretary to refer specifically to "unique problems" or to disruptions that reach extraordinary magnitudes. 49 U.S.C. § 303(c) (1982). The § 4(f) language, instead, requires the Secretary to inquire into and determine what is prudent, that is, sensible. *Id.* In making the inquiry, the Secretary must use his judgment, must balance competing interests, and practically must settle disputes over which reasonable people may disagree. *See Eagle Found.*, 813 F.2d at 804.

Second, in *Maryland Wildlife Fed'n*, the Fourth Circuit recognized that a court reviewing the Secretary's decision fulfills its duty if it determines that the Secretary considered all relevant factors and standards and it reasonably and thoroughly reviews the voluminous record accumulated over a long period of time, regardless of whether the reports and studies use the "magic" terminology. *See Maryland Wildlife Fed'n*, 747 F.2d at 237; *see also Louisiana Envtl. Soc'y. Inc. v. Dole*, 707

F.2d 116, 122–23 (5th Cir.1983); *Adler v. Lewis*, 675 F.2d 1085, 1095 (9th Cir.1982); *Monroe County Conservation Council v. Adams*, 566 F.2d 419, 426 ((2d Cir.1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

Third, in remanding this matter, the Fourth Circuit specifically directed *this Court* to find "whether the Secretary found that the alternatives were not 'prudent' as defined by *Overton Park*." *Hickory Neighborhood*, 893 F.2d 58, 62 (emphasis added).

And, finally, in *Overton Park*, the Supreme Court considered the Secretary's failure to make formal findings and state reasons for allowing a highway to be built through § 4(f) land. *See Overton Park*, 401 U.S. at 417, 91 S.Ct. at 824. The Supreme Court stated:

> Undoubtedly, review of the Secretary's action is hampered by his failure to make such finding, but the absence of formal findings does not necessarily require that the case be remanded to the Secretary. Neither the Department of Transportation Act nor the Federal–Aid Highway Act requires such formal findings.

*Id.* Thus, the Supreme Court has recognized that the Secretary's failure to make specific findings is not fatal to his decision requiring a remand to him, but merely hampers a court's review of his decision. *Id.*

In its previous opinion, this Court exhaustively discussed the chronology of this project, with the genesis of the widening project commencing in 1966 when the City of Hickory designated N.C. 127 as a major north/south thoroughfare. *See Hickory Neighborhood*, 703 F.Supp. at 1211–1215. During the ensuing twenty-four years, the Secretary conducted several public hearings, circulated the draft environmental impact statement (DEIS) and the final environmental impact statement (FEIS) to several agencies, prepared mitigation measures, and engaged in engineering studies, traffic studies and traffic projections. In making its thorough, probing and in-depth review and in preparing its original opinion, this Court reviewed the myriad of doc-

uments prepared by the Secretary and all of the other evidence. On remand, this Court now has reviewed the Fourth Circuit's opinion and directions in this case, this Court's previous Findings of Fact and Conclusions of Law, the parties' supplemental submissions, and the applicable law. Based upon a thorough review of the record, this Court concludes that the Secretary's decision complied with *Overton Park* in rejecting the Alternatives as imprudent, that is, not sensible.

Additionally, this Court has focused on the relevant factors to determine whether they supported the Secretary's decision and has determined that they do. In this Memorandum, the Court already has stated the reasons that the Secretary found the alternative routes would not be prudent. The Court, however, briefly will summarize those reasons.

First, in considering Alternatives 2A and 2B, the Secretary recognized the existence of several consequences resulting from a selection of the one-way pair arrangement. The one-way pair arrangement would have required the use of two streets in the CHD, rather than only one street. The one-way pair arrangement also would have limited access to the two hospitals located in the CHD. Further, the one-way pair arrangement would have disrupted the stable residential neighborhoods by increasing the volume and type of traffic passing through the neighborhood. Moreover, the one-way pair arrangement would have increased the volume of traffic on the inadequate cross-streets. Furthermore, the one-way pair arrangement would have required travellers to negotiate two dangerous ninety-degree turns at the southern terminus of the south-bound leg.

Second, in considering Alternatives 3A and 3B, the Secretary identified that Alternatives 3A and 3B would not have provided access to areas along N.C. 127. Alternatives 3A and 3B also would not change significantly traffic patterns to relieve the flow of traffic on N.C. 127. Further, Alternatives 3A and 3B would not eliminate the existing need for improving the N.C. 127. Additionally, Alternatives 3A and 3B would require the construction of new and relocated alignments, which would force residences or businesses to be displaced or to relocate. Moreover, Alternative 3A or Alternative 3B would cost approximately twice as much as the widening of N.C. 127 and nearly three times as much as Alternative 2A or Alternative 2B. Furthermore, Alternative 3A or Alternative 3B would require the acquisition of an additional eighty-foot right-of-way. And finally, Alternatives 3A and 3B would not change the condition of N.C. 127, which would remain in the same condition as if the Secretary had selected Alternative 5, the No Build Alternative.

Third, the Secretary considered Alternative 4, the Postponement Alternative, and recognized that the Postponement Alternative only would postpone indefinitely the traffic flow problem between intersections along N.C. 127. Additionally, the Secretary recognized that the Postponement Alternative significantly would increase the cost of the project.

Fourth, and finally, the Secretary considered Alternative 5, the No Build Alternative. The Secretary noted that although not disturbing the § 4(f) property, the No Build Alternative obviously would not solve the existing traffic flow problems on N.C. 127 and would deny the public the long term benefits of improved traffic operation and safety on N.C. 127.

In reviewing the facts before the Secretary, the Court recognizes that no single factor considered by the Secretary, or this Court, would justify the rejection of any of the Alternatives as being not prudent. It is not necessary, however, for any single factor to present a "unique problem" or for any single factor independently to provide a basis for the Secretary's rejection of an alternative. *See Town of Fenton v. Dole,* 636 F.Supp. 557, 567 (N.D.N.Y.1986), *aff'd,* 792 F.2d 44 (2d Cir.1986) (per curiam). Instead, the collective impact of adverse factors such as environmental impacts, safety, geometric problems, decreased traffic service, increased cost, and any other relevant factor, properly may be considered. *See Eagle Found.,* 813 F.2d at

805 (recognizing that "No feather weighs very much, but a ton of feathers still weighs as much as a 2,000 pound block of lead."); *Town of Fenton*, 636 F.Supp. at 567 (holding that Secretary may take cumulative effects into account); *Citizens to Preserve Wilderness Park, Inc. v. Adams*, 543 F.Supp. 21, 35 (D.Neb.1981) (finding that Secretary properly could consider cumulative effect of relevant factors), *aff'd mem.*, 685 F.2d 438 (8th Cir.1982).

This Court is firmly convinced that the facts before the Secretary support his decision that the Alternatives were not prudent as defined by *Overton Park*. The Court concludes that the Secretary's rejection of the Alternatives and decision to use § 4(f) land satisfy the statute.

The Court finds that the facts before the Secretary support the conclusion that the aggregate effect of factors related to the one-way pair arrangement would cause community disruption of an extraordinary magnitude and, therefore, that the one-way pair arrangement would not be prudent as defined by *Overton Park*. The Court finds, further, that the facts before the Secretary support the conclusion that factors related to Alternatives 3A and 3B would create cost and community disruption of an extraordinary magnitude and, thus, that Alternatives 3A and 3B would not be prudent as defined by *Overton Park*.

In *Eagle Found.*, the Seventh Circuit appropriately summarized the situation existing before it as follows:

> A prudent judgment by an agency is one that takes into account everything important that matters. A cumulation of small problems may add up to a sufficient reason to use § 4(f) lands. It would be imprudent to build around the park if the Secretary were convinced that the aggregate injuries caused by doing so exceeded those caused by reducing the size of the park. Even a featherweight drawback may play some role. No feather weighs very much, but a ton of feathers still weighs as much as a 2,000 pound block of lead.

*Eagle Found.*, 813 F.2d at 805 (citations omitted). This Court believes that the Seventh Circuit's language in *Eagle Found.* is just as appropriate in reference to the one-way pair arrangement and Alternatives 3A and 3B in the case now before this Court.

The Court finds, furthermore, that the facts before the Secretary support the conclusion that the Postponement Alternative or the No Build Alternative also would not be prudent under *Overton Park*. Courts ordinarily affirm the Secretary's decision to reject a possible alternative route as being imprudent when the alternative route would fail to meet the transportation needs of the community. *See Ringsred v. Dole*, 828 F.2d 1300, 1304 (8th Cir.1987) (affirming Secretary's and district court's determination that alternative failing to meet one of project's main objectives was imprudent); *Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 715 (11th Cir.1985) (affirming district court's finding that because no-build alternative would fail to meet need for which project was designed, Secretary correctly concluded that no-build alternative was not prudent); *Maryland Wildlife Fed'n*, 747 F.2d at 242 (affirming district court's finding that because alternatives were inconsistent with purpose of project, alternatives were not feasible or prudent); *Coalition for Responsible Regional Dev.*, 555 F.2d at 401 (finding that failure of proposed alternatives to meet objective of project was valid reason for district court to find that alternative was not viable). Moreover, Congress explicitly has prohibited the Secretary from approving projects that fail to meet existing and probable future traffic needs and conditions in a manner conducive to safety, durability and economy of maintenance. *See* 23 U.S.C. § 109(a) (1982).

Although the Court believes that neither *Overton Park* nor § 4(f) requires the Court specifically to find that the problems presented by the alternative routes were unique, rather than merely prudent, the Court's probing inquiry unmistakably would lead the Court to such a finding because of the cumulative effects of problems with all of the Alternatives and merely because of the failure of the Alterna-

tives to meet the transportation needs of the community.

In conclusion, the Fourth Circuit remanded this case for further proceedings. The Fourth Circuit directed this Court to find whether the Secretary determined that the Alternatives were not *prudent* in light of *Overton Park*, and whether the facts before the Secretary supported his determination. This Court now has made those findings. This Court has determined that the Secretary determined that the Alternatives to the widening of N.C. 127 were not prudent as defined by the Supreme Court's decision in *Overton Park* and also has determined that the facts before the Secretary supported his decision to reject the Alternatives and to use § 4(f) land. The Court believes that by virtue of these findings, no further inquiry on remand is necessary. *See Hickory Neighborhood*, 893 F.2d 58, 62.

### V. HNDL's MOTION FOR INJUNCTION AND REQUEST FOR HEARING

On January 30, 1990, HNDL filed a Motion for Injunction, requesting the Court to enjoin permanently the Secretary from proceeding with any aspect of the proposed project until the Secretary has complied with *Overton Park*. Because the Court has found that the Secretary complied with § 4(f) and *Overton Park* and that sufficient facts supported the Secretary's decision, the Court believes that an injunction is inappropriate. The Court, therefore, will deny Plaintiff's Motion for Injunction.

The Court also has considered Plaintiff's request for a hearing to present oral argument to the Court. The Court believes that based on the parties' well-drafted briefs, a careful review of the Fourth Circuit's opinion and directions in this matter, and a close scrutiny of the applicable law, a hearing is unnecessary to dispose of the issues remanded to this Court by the Fourth Circuit.

### VI. ORDER OF THE COURT

NOW, THEREFORE, IT IS ORDERED that Plaintiff's Motion for Injunction be, and hereby is, *DENIED*, and Plaintiff's request for a hearing be, and hereby is, *DENIED*.